UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------X
BASHEEN RUSH,

                Petitioner,                **R E P O R T   A N D**
   - against -                           **RECOMMENDATION**

                                           99 CV 2840 (DGT)
CHRISTOPHER ARTUZ,

                Respondent.
---------------------------------------------------X

      On June 7, 1995, petitioner Basheen Rush was convicted and sentenced to consecutive

terms of imprisonment of twelve and one-third to twenty-five years for rape in the first degree

and robbery in the first degree. On May 14, 1999, petitioner, proceeding pro se, filed a writ of

habeas corpus, pursuant to 28 U.S.C. § 2254, alleging nine grounds: (1) that due to errors in the

DNA analysis, the identification of petitioner as the assailant was based solely on circumstantial

evidence and his guilt had not been proven beyond a reasonable doubt; (2) the trial court erred in

denying petitioner's request to allow a defense expert to conduct DNA testing, depriving

petitioner of the effective assistance of counsel and of a fair trial; (3) prosecutorial misconduct

deprived petitioner of a fair trial; (4) the trial court erred in refusing to declare a mistrial and to

dismiss the indictment after a prosecution witness testified that petitioner had been arrested in his

parole office; (5) the court erred in denying petitioner's motion to dismiss for speedy trial

violations; (6) petitioner's sentence was excessive; (7) the prosecution failed to turn over

documents prior to trial; (8) the trial transcript was erroneously read back to the jury, and (9) the

ineffectiveness of appellate counsel.

By Order dated November 21, 2001, the petition was referred to the undersigned to prepare a Report and Recommendation. On January 8, 2003, this Court issued a Report ("Rep't"), recommending that the petition be dismissed without prejudice based on a failure to exhaust the seventh and eighth claims for relief set forth in the petition.[1] Petitioner filed objections to this Court's Report and also requested an evidentiary hearing, raising a claim of ineffective assistance of counsel based on trial counsel's alleged failure to understand the DNA testing process and his failure to investigate conflicting test results. In an Order dated September 17, 2003, the district court administratively closed the case to allow petitioner to exhaust certain claims in state court.

On December 11, 2003, Rush filed a motion in Kings County Supreme Court pursuant to New York Criminal Procedure Law § 440, raising the arguments set forth in claims seven and eight of his petition, as well as the ineffective assistance of counsel claim raised in his objections. N.Y. Crim Proc. Law § 440 (McKinney 2005). On January 26, 2004, Justice Alan Marrus denied petitioner's Section 440 motion. The Appellate Division subsequently denied Rush's request for leave to appeal on December 7, 2004.

On December 27, 2004, Rush re-filed his petition, and by Order dated August 9, 2007, claims (1), (2), (3), (4), (7), (8), and (9) – the ineffective assistance of counsel claim – were referred to the undersigned to prepare a Report and Recommendation.

---

[1]The Court also recommended that Rush's fifth and sixth claims in his petition be denied as procedurally barred from habeas review. In his objection to the Report and Recommendation, petitioner withdrew the fifth and sixth claims for relief. (See Order dated September 17, 2003 at 2).

## FACTUAL BACKGROUND

As detailed in the Court's 2003 Report and Recommendation, the defendant was charged by a Kings County grand jury with rape, two counts of assault in the second degree, three counts of sexual abuse in the first degree, robbery in the first and second degrees, and grand larceny in the fourth degree.[2] (Affidavit of Assistant District Attorney Ruth E. Ross in Opp. to Pet. for Writ of Habeas Corpus ("Ross Aff.") ¶ 3; Affirmation in People's State Appellate Appendix). The charges stemmed from the February 12, 1994 attack on Ms. Carmen Rentas as she was walking to the subway from her home in Brooklyn at approximately 6:00 in the morning. (Ross Aff. ¶ 3). She was grabbed from behind and dragged at knife-point to the roof of a building in the Marlborough Housing Projects, where the assailant threatened to kill her if she screamed. (Id.) She was brutally beaten and raped, after which he ripped the jewelry off her neck and arms and cut open her clothes looking for money.

Based upon an anonymous tip, the police showed Ms. Rentas a photo array that included a picture of petitioner Rush. (Id.) Ms. Rentas identified him from the photo array as the assailant and he was arrested. (Id.) She later picked him out of a lineup as well. (Id.)

In April 1995, more than a year after the attack, petitioner was tried before a jury in Kings County. (Id. ¶ 4). At trial, Ms. Rentas, whose eyesight had been seriously impaired as a result of damage to her eyes caused by the attack, incorrectly identified petitioner's cousin as the assailant. (Id.) However, through DNA evidence, the petitioner was positively identified as her attacker.

---

[2] See N.Y. Penal Law § 130.35[1] (McKinney 2001) (rape in the first degree); N.Y. Penal Law §§ 160.15[3], 160.10 (McKinney 1998) (robbery in the first and second degrees); N.Y. Penal Law § 120.05 (McKinney 2008) (assault in the second degree); N.Y. Penal Law § 130.65[1] (McKinney 2001) (sexual abuse in the first degree); N.Y. Penal Law § 155.30 (McKinney 2001) (grand larceny in the fourth degree).

(Id.) The trial court denied petitioner's motion to dismiss the charges, finding that the DNA evidence was sufficient. People v. Rush, 165 Misc. 2d 821, 630 N.Y.S.2d 631 (N.Y. Sup. Ct. 1995).

On June 7, 1995, petitioner was found guilty on the charges of rape in the first degree and robbery in the first degree and subsequently sentenced to consecutive terms of imprisonment of twelve and one-third to twenty-five years. (Ross Aff. ¶ 5).

On October 22, 1995, petitioner, proceeding pro se, filed a motion to vacate the judgment of conviction pursuant to New York Criminal Procedure Law § 440.10, arguing that the prosecution failed to supply sufficient information regarding the testing procedures used by the prosecution's expert witness. N.Y. Crim. Proc. Law § 440.10 (McKinney 2005). By Order dated December 20, 1995, the court denied the motion to vacate, finding that the defense had been provided with sufficient information to prepare for trial and that defense counsel had reviewed the information with his own experts and utilized that information to cross-examine the prosecution's expert. (See Decision and Order, dated Dec. 20, 1995, Ex. M to Pet.'s Mem.[3]).

A.  AEDPA Standards

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), the authority of federal courts to grant writs of habeas corpus on the merits of claims filed by state prisoners is limited to instances in which it can be shown that the adjudication of a claim on the merits in state court (1)

---

[3]"Pet.'s Mem." refers to the document filed by petitioner, entitled "Petitioner's Supporting Law for 28 U.S.C. § 2254 Petition of Habeas Corpus."

"resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

In Williams v. Taylor, 529 U.S. 362, 404-05 (2000), the Supreme Court indicated that the "contrary to" and "unreasonable application" clauses of Section 2254(d)(1) have independent meanings. Id. Under the first prong, a state court decision is considered to be "contrary to" clearly established federal law where the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or where the state court "confronts a set of facts that are materially indistinguishable" from those considered by the Supreme Court, but "nevertheless arrives at a result different from [Supreme Court] precedent." Id. at 405-06; accord Overton v. Newton, 295 F.3d 270, 275 (2d Cir. 2002); Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000). The precedents providing guidance in this analysis are "'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" Overton v. Newton, 295 F.3d at 275-76 (quoting Williams v. Taylor, 529 U.S. 362, 412 (2000)).

Under the "unreasonable application" prong of Section 2254(d)(1), a state court decision will be set aside if it involves an "unreasonable application" of the correct governing legal rule to the particular facts of the case, see Williams v. Taylor, 529 U.S. at 407, 409; Overton v. Newton, 295 F.3d 270, 275, or "refuses to extend a legal principle that the Supreme Court has clearly established to a new situation in which it should govern." Hoi Man Yung v. Walker, 468 F.3d 169, 176 (2d Cir. 2006) (citing Kennaugh v. Miller, 289 F.3d 36, 45 n.2 (2d Cir. 2002)). In conducting this analysis, the appropriate inquiry is whether the decision was objectively

unreasonable, not merely whether it was incorrect or erroneous. <u>Williams v. Taylor</u>, 529 U.S. at 409-12. However, while "[s]ome increment of incorrectness beyond error is required[,] . . . [that] increment need not be great; otherwise, <u>habeas</u> relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'" <u>Francis S. v. Stone</u>, 221 F.3d 100, 111 (2d Cir. 2000) (internal citation omitted); <u>accord</u> <u>Durant v. Strack</u>, 151 F. Supp. 2d 226, 234 (E.D.N.Y. 2001). In <u>Overton</u>, the Second Circuit, in interpreting <u>Williams</u>, reaffirmed its view that "the standard to be applied 'falls somewhere between merely erroneous and unreasonable to all reasonable jurists.'" 295 F.3d at 277 (quoting <u>Jones v. Stinson</u>, 229 F.3d at 119). The Second Circuit also acknowledged that "there has been considerable uncertainty as to how broadly or narrowly lower courts should construe principles defined by the Supreme Court in order to determine whether state courts have applied them reasonably." <u>Id.</u>

Under the AEDPA, a state court's determination of a factual issue is "presumed to be correct," 28 U.S.C. § 2254(e)(1); <u>Overton v. Newton</u>, 295 F.3d at 275, and the petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). A state court's decision on the merits must be accorded AEDPA deference even where it "does not explicitly refer to either the federal claim or to relevant federal case law." <u>Sellan v. Kuhlman</u>, 261 F.3d 303, 312 (2d Cir. 2001). Moreover, "a decision adjudicated on the merits in a state court and based on a *factual* determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(d)(2)) (emphasis added).

B.  <u>Procedural Default</u>

Before turning to the merits of petitioner's claims, the Court must first determine whether the claims are subject to habeas review.  Although the Court has already addressed the issue of exhaustion of state court remedies (see Rep't at 7-20), there is a second, distinct issue that must be addressed in addition to the requirement that a prisoner exhaust state remedies prior to filing a habeas petition; that is the problem of waiver, or procedural default.  See Engle v. Isaac, 456 U.S. 107, 125 n.28 (1982); Francis v. Henderson, 425 U.S. 536 (1976).  The State argues that four of petitioner's other claims are barred from habeas review by the state appellate court's finding of procedural default.

1.  Standards

In order for federal habeas review to be procedurally barred, a state court "must actually have relied on a procedural bar as an independent basis for its disposition of the case, and the state court's reliance on state law must be unambiguous and clear from the face of the opinion." Galarza v. Keane, 252 F.3d 630, 637 (2d Cir. 2001) (citing Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 809 (2d Cir. 2000); Jones v. Stinson, 229 F.3d 112, 118 (2d Cir. 2000)); see also Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990).  The Supreme Court has made it clear that a state procedural default will not act as a bar to a federal court's consideration of a federal claim on habeas review unless the highest state court to consider the issue "'clearly and expressly states that its judgment rests on a state procedural bar.'"  Coleman v. Thompson, 501 U.S. 722, 735-36 (1991) (quoting Harris v. Reed, 489 U.S. 255, 263, 269 (1989) and holding "[i]n habeas, if the decision of the last state court to which the petitioner presented his federal claims . . . did not

clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition").

## 2. Application

In this case, the State argues that petitioner's second, third, and fourth claims are barred from review due to a procedural default below.

First, with respect to petitioner's claim that the trial court improperly refused to provide petitioner with his own DNA expert, the State argued on appeal that the petitioner not only was offered but in fact obtained his own expert. (Respondent's Mem. of Law in Opposition to Pet. for Writ of Habeas Corpus ("Resp.'s Mem.") at 2). The only request that was denied by the trial court was petitioner's request, made on the eve of trial, to postpone his trial for four months while his expert conducted a second round of DNA tests. (Id.) The State argued on appeal that not only was this claim of error "mostly unpreserved" but it was without merit as well. (Id. at 2).

On appeal, petitioner also challenged as improper various statements made by the prosecution during summation. (Id.) In response, the State argued on appeal that the claim was unpreserved for appellate review because petitioner had failed to object at the time of the trial and that, in any event, the claim was meritless. (Id.)

With respect to the petitioner's claim that the trial court failed to grant a mistrial after the petitioner objected to testimony from a prosecution witness, the prosecution noted on appeal that the trial court had offered to grant a mistrial but that petitioner declined the offer after the court explained that at the new trial, the complaining witness would be permitted another opportunity to identify petitioner. (Id. at 3). On appeal, the prosecution argued that, by explicitly

8

withdrawing his motion for a mistrial and personally agreeing to the decision, petitioner affirmatively waived his claim and failed to preserve it for appellate review. (Id. (citing N.Y. Crim. Proc. Law § 470.05[2])).

The State argues that these three claims now raised by petitioner are not subject to federal habeas review because the Appellate Division Second Department, the highest state court to rule on Rush's claims, relied on a procedural bar as an independent basis for denying these claims on appeal. (Resp.'s Mem. at 1-2). However, the State acknowledges that in the court's decision on appeal, the Appellate Division did not explicitly address these three claims. Instead, after discussing in detail petitioner's claims of error based on the DNA evidence, the Appellate Division concluded its opinion by stating: "[t]he defendant's remaining contentions are either unpreserved for appellate review . . . or without merit." People v. Rush, 242 A.D.2d 108, 111, 672 N.Y.S.2d 362, 364 (2d Dep't 1998) (internal citations omitted).

The language used by the Appellate Division in disposing of petitioner's remaining claims has been found by the Second Circuit to be insufficient to create a procedural bar. See Jimenez v. Walker, 458 F.3d 130, 146 (2d Cir. 2006), cert. denied, 127 S. Ct. 976 (2007) (citing Fama v. Comm'r of Corr. Servs., 235 F.3d at 801-11 (holding that "when a state court uses language such as '[t]he defendant's remaining contentions are either unpreserved or without merit,' the validity of the claim is preserved and is subject to federal review") (emphasis added) (internal quotation omitted)). In Jimenez v. Walker, the Second Circuit reviewed the evolution of its earlier decisions analyzing whether "AEDPA deference applies when confronted by such ['either/or'] language in state court opinions." 458 F.3d at 136. Endorsing the analysis in Ryan

9

v. Miller, 303 F.3d 231, 246 (2d Cir. 2002),[4] the Circuit court in Jimenez held that "federal habeas courts should distinguish between two mutually exclusive categories of state-court decisions disposing of a federal claim: (1) state-court decisions that fairly appear either to rest primarily on federal law, or to be interwoven with federal law and (2) state-court decisions that fairly appear to rest primarily on state procedural law." 458 F.3d at 138. If the reviewing court determines that it has "'good reason' to doubt that the decision rests on an independent and adequate state ground," id. at 137 (quoting Coleman v. Thompson, 501 U.S. at 739), the claim is presumed to have been adjudicated on the merits, and AEDPA deference to the state court adjudication applies. Id. at 146.[5] Indeed, in the absence of a clear and express reliance on a state procedural bar, those state court decisions that fall within the first category must be "afforded AEDPA deference as adjudications 'on the merits' under 28 U.S.C. § 2254(d). Id. at 145.

Where, however, decisions in the first category clearly state a reliance on a state

---

[4]In Ryan, the court decided to read the "either/or" language of the state court "'as having adjudicated Ryan's claim on its merits' because (1) there was nothing on the face of the state court's opinion to indicate that the claim was decided on procedural grounds and (2) it was undisputed that no procedural bar existed." Jimenez v. Walker, 458 F.3d at 141-42. In this case, the Circuit, "for the first time, . . . linked the AEDPA-deference determination with the procedural bar determination," id. at 142, noting that AEDPA deference may more accurately be thought of as a "limitation on relief" than a "deferential 'standard of review.'" Id. at 135 n.2 (citing Cotto v. Herbert, 331 F.3d 217, 229 n.4 (2d Cir. 2003)).

[5]Had the Appellate Division used the conjunction "and" rather than "or," the result here would have been different. Case law clearly distinguishes between the ambiguity of a holding that a claim is "either procedurally barred or without merit" as explained above, and the clarity of a holding that uses "and." Where the state court has issued a holding that the claims "were not preserved for appellate review, in addition to finding that they were, in any event, without merit," then the procedural ground is an adequate and independent state ground that will bar federal review. Velasquez v. Leonardo, 898 F.2d at 9 (emphasis added); see also Phillips v. Smith, 717 F.2d 44, 47-48 (2d Cir. 1983) (stating that where the state court explicitly relies on a procedural default to dispose of the claim and then also proceeds to rule on the merits of the claim, federal review is procedurally barred), cert. denied, 465 U.S. 1027 (1984).

procedural bar, or where the decisions fall within the second category and rest on an independent state procedural bar, "[n]o AEDPA deference is due to these decisions but the state may successfully assert that habeas relief is foreclosed provided that the independent state procedural bar is adequate to support the judgment and that neither cause and prejudice nor a fundamental miscarriage of justice is shown." Id. Thus, when, as here, a state court rejects a claim as "either unpreserved or without merit," the state court has not adequately indicated that its judgment rests on a state procedural bar. Id.; Fama v. Comm'r of Corr. Servs., 235 F.3d at 801-11.

Although the Appellate Division in this case cited a number of cases in two parentheticals in the court's holding,[6] these citations do not clearly and unambiguously show that the Appellate Division determined that each of petitioner's claims were unpreserved for appellate review. Indeed, the holdings of the cited cases indicate several grounds on which petitioner's three claims could have been held to be procedurally barred, or could have been disposed of on the merits.

Specifically, in the parenthetical immediately following the conclusion that the remaining claims are unpreserved for appellate review, the Appellate Division in this case cited New York Criminal Procedure Law § 470.05 and People v. Balls, 69 N.Y.2d 641, 503 N.E.2d 1017, 511 N.Y.S.2d 586 (1986). Both of these cited authorities stand for the proposition that counsel must make an appropriate objection in order to preserve an issue for appeal. In People v. Balls, the Court of Appeals held that in order to preserve an objection for appeal, counsel must articulate the objection with sufficient specificity to alert the court to the contested issue. 69 N.Y.2d at

---

[6]See People v. Rush, 242 A.D.2d at 111, 672 N.Y.S.2d at 364 (holding that "[t]he defendant's remaining contentions are either unpreserved for appellate review (see CPL 470.05; People v. Balls, 69 N.Y.2d 641) or without merit (see People v. Singleton, 41 N.Y.2d 402, 405; People v. Melvin, 223 A.D.2d 604; see also People v. Lawrence, 64 N.Y.2d 200, 203; People v. Harvall, 196 A.D.2d 553; People v. Williams, 114 A.D.2d 683)").

11

642; 503 N.E.2d at 1018; 511 N.Y.S.2d at 587. Similarly, Section 470.05 of the Criminal

Procedure Law requires the party seeking appellate review of an error of law to have preserved

the objection by appropriate protest. Unfortunately, it is not clear whether the Appellate

Division's citation to Balls and to Section 470.05 was intended to apply to all of the remaining

claims or to just certain claims.

Moreover, a review of the cases cited in the parenthetical immediately following the

court's holding that the claims were "without merit" compounds the uncertainty. Both People v.

Singleton, 41 N.Y.2d 402, 361 N.E.2d 1003, 393 N.Y.S.2d 353 (1977), and People v. Melvin,

223 A.D.2d 604, 636 N.Y.S.2d 827 (2d Dep't 1996), appear to relate to petitioner's claim that

the trial court erred in refusing to grant an adjournment of the trial to conduct additional DNA

testing. Two of the other cited cases, People v. Lawrence, 64 N.Y.2d 200, 474 N.E.2d 593, 485

N.Y.S.2d 233 (1984), and People v. Harvall, 196 A.D.2d 553, 601 N.Y.S.2d 146 (2d Dep't

1993), address speedy trial concerns; and People v. Williams, 114 A.D.2d 683, 494 N.Y.S.2d

563 (3d Dep't 1985), deals with the issue of excessive sentence. It is unclear from these citations

whether the appellate court intended to resolve petitioner's claims of error as to these issues on

the merits or on procedural grounds. Certainly, there were claims for which there was no

relevant citation mentioned in the Appellate Division's decision -- namely, petitioner's claim as

to prosecutorial misconduct and his claim of error based on the witness' mention of his arrest in

the parole office. Due to the language of the court's opinion, it is possible that only these two

grounds were unpreserved and thus not subject to review on this habeas petition, while the other

claim was denied on the merits and thus, is not procedurally barred.

Moreover, because the appellate court's decision states that all of the remaining claims are either "unpreserved for appellate review or without merit" -- there is the distinct possibility that the court considered the merits of each claim as well. People v. Rush, 242 A.D.2d at 111, 672 N.Y.S.2d at 364 (internal citations omitted). The Appellate Division may have recognized a waiver of the procedural bar and elected to consider the merits of the claims as is permissible under the court's interest of justice jurisdiction. See, e.g., People v. Bourne, 139 A.D.2d 210, 212-13, 531 N.Y.S.2d 899, 900-01 (1st Dep't 1988) (citing N.Y. Crim. Proc. Law §§ 470.15[3], 470.15[6][b]). If, as the State argues, all of petitioner's remaining claims were satisfactorily disposed of on procedural grounds, then there would have been no need for the court to have added the phrase "or without merit." People v. Rush, 242 A.D.2d at 111. Since the language used by the state court did not distinguish among petitioner's "remaining contentions," such language does not show that the state court "clearly and unambiguously" relied on a procedural bar in denying Rush's claims. Hayes v. Coombe, 142 F.3d 517, 518, 519 n.2 (2d Cir. 1998) (quoting Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997)).

Applying the holding in Jimenez, this Court finds that petitioner's claims relating to the denial of time for his DNA expert to conduct tests, to the prosecution's statements in summation, and to the court's refusal to grant a mistrial were decided on the merits and not on a procedural bar. See Jimenez v. Walker, 458 F.3d at 138.

Accordingly, this Court will address the merits of each of petitioner's claims under the AEDPA standards.

C.  Merits – Standards under the AEDPA

In light of this Court's conclusion that petitioner's Claims Two, Three, and Four are not

procedurally barred, this Court will address the merits of these claims. This Court has also

reviewed the merits of the petitioner's remaining claims, including Claims Seven, Eight, and

Nine.

### 1. Claim One - Insufficient Evidence

Petitioner's first claim for habeas relief seeks to overturn his conviction on the grounds

that there was insufficient evidence to support his identification as the perpetrator of the offense.

He bases his argument on the victim's failure to identify him at trial, erroneously identifying a

spectator in the courtroom as her assailant, and the lack of any other evidence linking him to the

crime apart from the DNA evidence, which he contends is insufficient to support the conviction.

(Pet. Mem. at 3-4).

### a. Standards

In Jackson v. Virginia, 443 U.S. 307, 320-21 (1979), the Supreme Court held that where a

state prisoner raises a claim that there was insufficient evidence to support a finding of guilt

beyond a reasonable doubt by a rational trier of fact, the prisoner has stated a claim cognizable in

a federal habeas corpus proceeding, pursuant to 28 U.S.C. § 2254. The Court held that the

critical inquiry was "whether the record evidence could reasonably support a finding of guilt

beyond a reasonable doubt," id. at 318, but instructed reviewing courts to determine "whether,

after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

14

could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319

(emphasis in original) (citing Johnson v. Louisiana, 406 U.S. 356, 362 (1972)).

Courts in the Second Circuit, in applying this standard of review, has admonished that

"all possible inferences that may be drawn from the evidence must be construed in the

prosecution's favor." Taylor v. Poole, 538 F. Supp. 2d 612, 619 (S.D.N.Y. 2008) (citing

Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996) (internal citation omitted)); see also United

States v. Badalamenti, 794 F.2d 821, 828 (2d Cir. 1986). The Circuit has also noted that

"assessments of the weight of evidence or the credibility of witnesses are for the jury and not

grounds for reversal on [habeas] appeal." Taylor v. Poole, 538 F. Supp. 2d at 619 (quoting

Maldonado v. Scully, 86 F.3d at 35 (internal citation omitted)). "Where the record supports

competing inferences, the habeas court must 'presume - even if it does not affirmatively appear

in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and

must defer to that resolution.'" Mannix v. Phillips, 390 F. Supp. 2d 280, 294 (S.D.N.Y. 2005)

(citing Wright v. West, 505 U.S. 277, 297 (1992) (internal citation omitted)); Dixon v. Miller, 56

F. Supp. 2d 289, 295 (E.D.N.Y. 1999).

  b. Trial Testimony

At the trial, the fifty-one year old victim, Carmen Rentas, testified that on the morning of

February 20, 1994, she left her home at 2336 West Eighth Street in Brooklyn at 6:00 a.m. and

was walking to the subway when she saw a man on the left side of the street. (Tr.[7] at 51, 54-56).

She described him as approximately five feet ten inches to five feet eleven inches tall. (Id. at 56).

---

[7]Citations to "Tr." refer to the transcript of trial proceedings held before the Honorable
Allan Marrus on April 12, 13, 14, 17, and 18, 1995.

When she got to the front of the community center, the man grabbed her from behind, put a knife to her face, and told her, "'son of a bitch, don't scream, because if not, I'll kill you.'" (Id. at 55). He tied her hands behind her back, put her scarf in her mouth, and took her to 2326 West Eighth Street, into the Marlborough Housing Project, where he punched her in the face and raped her. (Id. at 58-59). He then cut off her clothes with his knife, went through her pocket and clothes looking for money, and took off two chains and two bracelets that she was wearing. (Id. at 59-60). After he left, she went to get help; the police were called; and she was taken to Coney Island Hospital, where she was given a gynecological examination and treated for knife cuts on her right leg and arm. (Id. at 61-65). Her eyes were swollen and bruised from the assault. (Id. at 66). Her nose was broken and her ear injured, requiring the insertion of a tube in her ear. (Id. at 67). As a result of the beating, her vision deteriorated to the point where she needed glasses to see distances when previously she did not wear glasses except for reading. (Id. at 76-78).

The police collected various items of Ms. Rentas' personal property from the scene, which she identified (id. at 68-70), but they were unable to obtain any fingerprints. (Id. at 27-28). Although Ms. Rentas had positively identified the defendant in a photo array and a lineup, the trial court did not permit the prosecution to introduce evidence in that regard, given Ms. Rentas' in-court identification of another gentleman[8] who was not the defendant. (Id. at 57-58, 73-75).

Police Detective Jose Astacio, employed by the New York City Housing Police, testified that he received an anonymous telephone tip from an informant regarding this case. (Id. at 101). Based on that information, he arrested petitioner on April 5, 1994. (Id. at 102). Another witness

---

[8]The other individual identified by Ms. Rentas was petitioner's cousin. (Tr. at 306).

for the prosecution, Sonia Liverman, who had lived in the Marlborough Housing Projects for 14 years, testified that she knew the petitioner as "Biggie," because she had seen him around the Marlborough Projects once or twice a week, standing in front of the store. (Id. at 290-93). In response to petitioner's counsel's questions, Detective Astacio testified that he picked up petitioner "at his parole office," prompting a motion for a mistrial. (Id. at 108).[9] Finally, the detective testified that he was present when both Ms. Rentas and petitioner had blood samples drawn; the detective vouchered the samples and sent them to the laboratory for analysis. (Id. at 105-07).

Patricia Zuppo, an assistant chemist employed by the Police Department, testified that she received the rape evidence kit collected after Ms. Rentas' attack, which tested positive for the presence of spermatazoa. (Id. at 151, 154). She also tested certain blood samples that she received as part of the kit and they tested positive for the presence of human blood. (Id. at 156-57). She also attempted to type the blood but could not reach a conclusive result. (Id. at 157). She then prepared a report and sent the two blood samples, anal swabs, vaginal swabs, and two dried secretions swabs, along with the blood samples from the petitioner and the victim, to the FBI for DNA testing. (Id. at 157, 160-61).

Dr. Keith Howland, Ph.D., a Special Agent with the FBI and an expert in the field of forensic analysis and profiling, performed an analysis on the samples received from Ms. Zuppo. (Id. at 166, 168-69, 190-205). Dr. Howland explained that in conducting a DNA profile, DNA, "[t]he so-called blueprint of life," is first extracted from certain cells in the body, and then tests are performed to develop "DNA profiles" of specific chromosomes in the DNA. (Id. at 170-71).

---

[9]That claim is addressed infra at pages 30-32.

As he testified, "there's areas of great variability from one person to the next" and "no two people have the same DNA except for identical twins." (Id. at 171). The object is to compare DNA profiles that are developed from forensic evidence, such as the blood and semen samples taken from the victim, to known blood samples taken from potential sources. (Id. at 171-72).

Dr. Howland testified that there are three possible conclusions that can be reached in conducting a DNA profile: 1) that there are no DNA profiles and the results are inconclusive, meaning that he could not say anything about the potential source, possibly because there was no DNA in the sample; 2) that there is an "exclusion" or no match, which means that the DNA could not have come from the parties; or 3) that the DNA from the forensic evidence matches or "includes" one of the parties. (Id. at 183-84). Approximately 70% of the FBI laboratory cases yield a set of DNA profiles, of which 35% are exclusions or negative matches. (Id.)

In conducting a DNA analysis, the FBI uses a "two-step match rule," requiring both a visual match between the known DNA profiles and the forensic evidence, and then a computer-assisted analysis to test the size of the DNA fragments in the samples. (Id. at 184-85). If the comparison falls within "plus or minus two and a half percent of one another," then a second match is determined to be present. (Id. at 185, 216).

In this case, Dr. Howland determined that the DNA extracted from the vaginal and anal swabs taken from the victim visually matched DNA from the petitioner at a total of four out of the six genetic loci.[10] (Id. at 200-01). Dr. Howland stated that "it is our experience that no two individuals are going to have the same set of DNA profiles over a set of four to six genetic loci."

---

[10]The doctor testified that he had information from the fifth genetic locus, which also appeared to be a visual match, but he did not use it in the numerical calculations. (Id. at 201).

(Id. at 201). The doctor then made a numerical calculation of the probability of finding another individual, unrelated to defendant, who had the same set of DNA profiles in either the black, white or Hispanic populations. (Id. at 202). After calculating the chance of a random match and the number of people who might also fit this DNA profile, Dr. Howland concluded:

> In this particular case, when I did all of the[] calculations and measurements and compared it to our databases, I determined that the probability of selecting another individual at random from the population that would have the same set of DNA profiles was less than one in 500 million for the Black, the White, and the Hispanic populations.

(Id. at 203). Dr. Howland testified that the FBI uses a "conservative approach" in its probability calculations and will not report probability numbers beyond one in 500 million, even if the actual probability may be smaller. (Id. at 204-05).


c. Analysis

1. Claim One - Insufficiency of the Evidence

Following the testimony, petitioner moved before the trial court to dismiss the charges, arguing that the DNA evidence alone was insufficient to support a conviction where the complaining witness had identified someone other than petitioner as her assailant. In a written decision dated June 7, 1995, the trial court denied the motion to dismiss on the merits, noting that while the only evidence at trial linking petitioner to the crime was the DNA evidence, the court concluded, "[t]here can be little doubt . . . that the perils of eyewitness identification far exceed those presented by DNA expert testimony." People v. Rush, 165 Misc. 2d 821, 826, 630

N.Y.S.2d 631, 634 (N.Y. Sup. Ct. 1995). Although the question was one of first impression, the court reviewed several decisions in other jurisdictions that had upheld convictions based solely on DNA evidence and reasoned that since DNA evidence had been used to reverse convictions based on eyewitness identification, it should be sufficient to support a conviction even in the face of contradictory eyewitness identification evidence. (Id. at 633).

On appeal, the Appellate Division affirmed, holding that "[t]here is no question that DNA profiling of the type employed here constitutes admissible, probative evidence in the State of New York." People v. Rush, 242 A.D.2d 108, 110, 672 N.Y.S.2d 362, 364 (2d Dep't 1998) (citing People v. Wesley, 83 N.Y.2d 417, 425 (1994), where the New York Court of Appeals found that since DNA profiling evidence has been found to be generally accepted as reliable by the scientific community, it is admissible and may be considered by the jury). The Appellate Division rejected petitioner's argument that because DNA evidence is circumstantial and not absolute or infallible, it cannot serve as the sole basis for a conviction. People v. Rush, 242 A.D.2d at 109, 672 N.Y.S.2d at 363. The court noted that "[v]irtually no evidence is absolutely conclusive in its probative import, and the defendant cites no authority which imposes such a standard of absolute certitude." Id. See also McKithen v. Brown, No. 02 CV 1670, 2008 WL 2791852, at *35 (E.D.N.Y. July 21, 2008) (noting that "[t]he results of modern DNA testing are of essentially unimpeachable reliability"). The court further noted that although the complaining witness had misidentified the defendant at trial, it was up to the jury to resolve any conflicting inferences arising from the evidence. People v. Rush, 242 A.D.2d at 110, 672 N.Y.S.2d at 364. The court concluded by stating that "we cannot conclude on the record before us that [the jury's] verdict was against the weight of the evidence." Id.

20

In his pro se petition, Mr. Rush raises the same arguments regarding the insufficiency of circumstantial evidence, such as the DNA profiling here, to negate the affirmative identification by the witness of a third party. He also challenges the expert's reliance on a profiling pool consisting of the general population rather than utilizing a pool composed solely of individuals of black ancestry, claiming that the expert's results were skewed and the reliance on a statistical probability of 1 in 500 million is therefore meaningless. This claim that the expert improperly combined several racial databases was raised by petitioner before the Appellate Division, which explicitly found the claim to be unpreserved for appellate review. People v. Rush, 242 A.D.2d at 110, 671 N.Y.S.2d at 364. The Appellate Division went further to find that even if the expert's testimony was reviewed, petitioner's challenge based on the use of an improper database was not supported by the evidence. Id. at 110-11, 671 N.Y.S.2d at 364.

Viewing the evidence in the light most favorable to the prosecution and drawing all possible inferences in the prosecution's favor, this Court finds that the record evidence reasonably supports a finding of guilt beyond a reasonable doubt. As the Appellate Division correctly noted, DNA profiling evidence, such as the type employed by the FBI expert in this case, has been found to constitute probative, admissible evidence. See, e.g., United States v. Jakobetz, 955 F.2d 786, 799-800 (2d Cir.), cert. denied, 506 U.S. 834 (1992). Indeed, "under New York law, DNA evidence -- standing alone and uncorroborated by any other evidence -- 'is sufficient to prove a defendant's guilt beyond a reasonable doubt.'" Warney v. City of Rochester, 536 F. Supp. 2d 285, 296 (W.D.N.Y. 2008) (citing Harrison v. Walsh, No. 06 CV 13328, 2007 WL 1576265, at *19-21 (S.D.N.Y. June 1, 2007) (collecting New York state cases)). It is also equally clear that it was for the jury to weigh the conflicting evidence of the

21

DNA profiles with the misidentification by the complaining witness and to resolve whatever conflict there was in the evidence. United States v. Jakobetz, 955 F.2d at 797, 800. Since this Court finds that the reasoning of the Appellate Division, both as to the sufficiency of the DNA evidence as well as the use of the database relied on by the expert, was neither contrary to clearly established federal law nor an unreasonable application of the law, 28 U.S.C. § 2254(d)(1), it is respectfully recommended that petitioner's first claim be denied on the merits.

### 2. Claim Two - Request for Adjournment and Appointment of DNA Expert

Petitioner next claims that the trial court erred in refusing to grant a continuance of the trial to allow petitioner the opportunity to retain his own DNA expert to conduct independent tests of the blood samples. Petitioner raised this claim on appeal to the Appellate Division, Second Department, which found that petitioner's claim was "either unpreserved . . . or without merit." See People v. Rush, 242 A.D.2d at 111, 672 N.Y.S.2d at 364. (See also Rep't at 4 (citing Def.'s State Brief on Appeal; Ross Aff. ¶ 6)). Accordingly, the Court will address this claim on the merits. See Jimenez v. Walker, 458 F.3d at 136.

According to the record, trial counsel was first appointed for petitioner on May 2, 1994, and on that same date, counsel indicated that he would be speaking to his client regarding DNA testing. (A5).[11] On November 28, 1994, an order was issued granting petitioner's request for the appointment of an expert to examine the DNA results. (A31). Petitioner then received the prosecution's expert witness' findings on January 9, 1995. (A38). At that time, it was clear from

---

[11]Citations to "A" refer to pages in People's State Appellate Appendix, Ex. L to Resp.'s Mem.

the record that petitioner had his own DNA expert.  Indeed, the prosecutor told the court: "[i]t is

my understanding, Mr. Walensky [petitioner's counsel] wants his expert to examine the tests that

were done by our [respondent's] DNA expert." (Id.)  Mr. Walensky further represented to the

court that one of the issues to be considered was whether the "[findings] would change if, [the

profile were] . . . limited [] to . . . Afro-Americans." (Id. at 39).

However, at no time during the period from May 2, 1994 until March 27, 1995, the day

the trial was scheduled to begin, did petitioner request an opportunity for the defense expert to

conduct his own independent testing.  Indeed, there appear to have been a number of defense

requests for adjournment of the trial -- first on February 13, 1995, and then on March 1, 1995 --

to allow the defense expert to complete his analysis and report. (A40, A48).  On the first day of

trial, March 27, 1995, petitioner, speaking for himself, made the request for DNA testing. (Id. at

A60-61).  At that time, his counsel added that he had been encouraging petitioner to submit to his

own test "early on." (Id.)  In denying the petitioner's request, the trial court made it clear that the

request would have been granted had it been made earlier. (Id. at A61-63).

It is well-established that a "trial court has 'broad discretion' in deciding whether to grant

a request for a continuance." Beverly v. Walker, 899 F. Supp. 900, 911 (N.D.N.Y. 1995)

(quoting Morris v. Slappy, 461 U.S. 1, 11 (1983)), cert. denied, 522 U.S. 883 (1997).  The

petitioner must demonstrate that there was an abuse of discretion by the trial court in

"unreasonably and arbitrarily denying a 'justifiable request for delay,'" id. (quotation omitted),

and that the petitioner's defense was substantially impaired by the denial.  United States v. King,

762 F.2d 232, 235 (2d Cir.), cert. denied, 475 U.S. 1018 (1986); Beverly v. Walker, 899 F. Supp.

at 911.  In making that determination, the reviewing court should consider the circumstances

surrounding the petitioner's request for a continuance. <u>Ungar v. Sarafite</u>, 376 U.S. 575, 589 (1964).

Here, petitioner and his counsel were aware as early as June 1994 that the prosecution was conducting a DNA analysis in connection with the case and indeed, an expert was granted to the defense early on in the process. Certainly, had there been a serious issue regarding the desirability of separate testing by petitioner's own expert, that issue should have been clear from the beginning. Even if the petitioner were to claim that the reliability of the prosecutor's witness and his testing did not became apparent until the initial report was issued by the prosecution's expert,[12] petitioner nevertheless waited for over four months -- until the very eve of trial -- to request additional testing, knowing how long a delay that would entail. Nothing in the record suggests that under these circumstances the trial court abused its discretion by denying petitioner's last minute request, particularly given the fact that the trial court had, at the time of this last-minute request, previously granted two earlier requests by petitioner for a delay in the trial. Indeed, the Appellate Division, in summarily holding that petitioner's continuance claim was "either unpreserved for appellate review . . . or without merit," indicated that it did not believe that the trial court had abused its discretion in refusing to grant defendant an adjournment. <u>See</u> <u>People v. Rush</u>, 242 A.D.2d at 111, 672 N.Y.S.2d at 364 (citing <u>People v. Melvin</u>, 223 A.D.2d at 604, 636 N.Y.S.2d at 828 (holding that "[t]he granting of an adjournment for any purpose is a matter of discretion for the trial court"); <u>People v. Singleton</u>, 41 N.Y.2d at 405, 361 N.E.2d at 1005, 393 N.Y.S.2d at 356 (same)).

More important, however, is the fact that petitioner has not even attempted to explain

---

[12]It should be noted in fact that there is no claim in this regard.

how the inability to conduct his own testing resulted in any prejudice to him or impaired his defense. He has not suggested that there were any flaws in the actual testing of the samples conducted by the prosecution's expert or that the results would have been different; his quarrel both at trial and before the state appellate courts has always focused on the method of analysis and conclusions of the prosecution's expert. This distinguishes petitioner's case from one in which a court refuses a request for a continuance to allow the defendant to obtain an expert; here, petitioner was merely seeking additional time to secure additional testing, which could have been undertaken long before trial. As such, the trial court's denial of a continuance was neither arbitrary nor unreasonable and did not unfairly prejudice petitioner. Beverly v. Walker, 899 F. Supp. at 911; see also United States v. Fisher, 808 F. Supp. 390, 394 (M.D. Pa. 1992) (denying motion for new trial where the trial court had failed to grant a continuance to allow additional testing by defendant's expert, noting that the request was made too late and denial would not unfairly prejudice the defendant).

Under a recent decision of first impression in this circuit, the court held, in the context of a Section 1983 civil rights action, that the refusal by the District Attorney's Office to grant access to physical evidence for the purpose of nonduplicative DNA testing violated the Due Process Clause of the Fourteenth Amendment so long as the testing could be performed with negligible cost to the state and exculpatory results would undermine confidence in the outcome of the trial. McKithen v. Brown, 2008 WL 2791852, at *36, *39. In McKithen, the plaintiff was accused of attempting to murder his wife with a kitchen knife. Id. at *1. However, police officers at the scene wrapped the knife in paper towels and as a result, it was never subjected to DNA testing. Id. at *2. Although the plaintiff in that case did not request that the knife be subjected to DNA

testing until his appeal over eight years later, the court found that the Constitution protects a right of access to test for DNA evidence regardless of the state court's finding that the request was untimely and there was no reasonable probability that the results of the testing would have resulted in a more favorable verdict.

In the case at hand, however, petitioner was not denied access to physical evidence for the purpose of DNA testing. Indeed, in this case, the state based the entire prosecution against petitioner on DNA evidence derived from blood samples, anal swabs, vaginal swabs, and dried secretions swabs. Instead, petitioner was not only given access to the evidence for testing, but he was granted his own expert as early as June 1994. Although his expert reviewed the evidence and the prosecutor's expert report, petitioner chose not to exercise his right to conduct independent DNA testing for at least four months after the prosecution's expert issued his initial report and nine months after petitioner became aware that the prosecution was conducting DNA testing in connection with the case. Most importantly, there has been no showing that petitioner's testing of the DNA would have been anything other than duplicative of that of the prosecution, which is explicitly excepted from the right enumerated in <u>McKithen</u>. <u>See id.</u> at *36. Accordingly, the Court finds that <u>McKithen</u> does not apply to petitioner's claim regarding DNA testing.

Under the AEDPA, a petitioner must show that a state court's decision was either contrary to federal law or an unreasonable application of the law. 28 U.S.C. § 2254(d)(1). Thus, even if <u>McKithen</u> were to apply, petitioner has failed to show that the state court's decision was "contrary to" clearly established law because <u>McKithen</u> is not clearly established law as set forth by the Supreme Court. <u>See Williams v. Taylor</u>, 529 U.S. at 404-05. Furthermore, under the

"unreasonable application" prong of Section 2254(d)(1), a state court decision will be set aside only if it involves an "unreasonable application" of the correct governing legal rule to the particular facts of the case. See id. at 407, 409; Overton v. Newton, 295 F.3d at 275. Given that McKithen cannot be said to apply to petitioner's claim in light of the widely divergent factual circumstances present here, the state court's decision to dismiss petitioner's DNA claim is not violative of the "unreasonable application" prong of the AEDPA. In summary, the trial court had broad discretion to grant or deny the adjournment, and it cannot be said that the Appellate Division's denial of petitioner's claim was either contrary to federal law or an unreasonable application of the law. See id.

Accordingly, it is respectfully recommended that this claim also be denied on the merits.


3. Claim Three - Prosecutorial Misconduct

The third claim in the petition alleges that the prosecutor denied petitioner due process by improperly interjecting the integrity of his office to bolster the prosecution's case or to argue facts not in evidence. Specifically, petitioner cites to an argument by the prosecutor in summation that "I can tell you that DNA evidence puts Mr. Rush at the scene . . . I'm submitting to you that it is a match" (Tr. at 336), despite the testimony by the expert Dr. Howland, who only provided statistics of the likelihood of a similar DNA profile and did not testify as to a "match." According to petitioner, this misconduct was compounded by the prosecutor's efforts to explain the complaining witness' misidentification by stating that she not only has vision problems but "is under who knows what emotional strain by not only being here in court but having to stand" and identify her assailant. (Tr. at 355). Petitioner argues that there was no evidence in the record

to suggest that the witness was under any emotional strain and argues that invoking this notion of fear "served to evoke sympathy for the complainant . . . ." (Def.'s State Br. on Appeal[13] at 25).

Petitioner raised this claim on appeal to the Appellate Division, Second Department, which found that petitioner's claim was "either unpreserved . . . or without merit." See People v. Rush, 242 A.D.2d at 111, 672 N.Y.S.2d at 364. (See also Rep't at 4 (citing Def.'s State Brief on Appeal; Ross Aff. ¶ 6)). Accordingly, the Court will address this claim on the merits. See Jimenez v. Walker, 458 F.3d at 136.

Generally, the propriety of a prosecutor's comments during summation is a matter to be decided according to state law.[14] See Daye v. Attorney General, 696 F.2d 186, 193-94 (2d Cir. 1982). Here, petitioner cites several state cases to support his argument that the prosecutor may not argue evidence or ask the jury to draw inferences from evidence that is not part of the record before the jury. See, e.g., People v. Ashwal, 39 N.Y.2d 105, 109-10, 347 N.E.2d 564, 566-67, 383 N.Y.S.2d 204, 206-07 (1976). He also relies on state case authority to support his claim that the prosecution may not argue to the jury that the witness' failure to make an identification was the result of fear on the part of the witness if there is no evidence in the record in that regard. See, e.g., People v. Weeks, 156 A.D.2d 133, 134, 548 N.Y.S.2d 179, 179 (1st Dep't 1989).

To obtain relief based on a claim of prosecutorial misconduct, the habeas petitioner must

---

[13]Citations to "Def.'s State Br. on Appeal" refer to Defendant's State Brief on Appeal, Ex. E to Resp.'s Mem.

[14]As discussed above, petitioner's failure to raise an objection to any one of these comments at a time when the trial court could have taken steps to cure the error constitutes a waiver of those claims under state law, and means that the claims were not preserved for appellate review. See N.Y. Crim. Proc. Law § 470.05(2); People v. Balls, 69 N.Y.2d 641 (1986). See discussion supra at 11-12.

demonstrate that "the prosecutor's comments during summation constituted more than mere trial error, and were instead so egregious as to violate Petitioner's due process rights." Layton v. Phillips, No. 04 CV 4032, 2008 WL 413785, at *12 (E.D.N.Y. Feb. 13, 2008) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 647-48 (1974); Tankleff v. Senkowski, 135 F.3d at 252; Floyd v. Meachum, 907 F.2d 347, 353 (2d Cir. 1990)). In determining whether the alleged misconduct amounted to "prejudicial error," courts must review the conduct in the context of the entire trial. Strouse v. Leonardo, 928 F.2d 548, 557 (2d Cir. 1991). The court should examine not only "the severity of the misconduct" but also "the measures adopted to cure [the misconduct], and the certainty of conviction absent the misconduct." United States v. Evangelista, 122 F.2d 112, 120 (2d Cir. 1997) (internal quotation marks and citations omitted). Only if the conduct deprived the defendant of a fair trial does it violate due process. United States v. Tyree, No. 06 CR 4469, 2008 WL 2164147, at *3 (2d Cir. May 22, 2008) (citing Blissett v. Lefevre, 924 F.2d 434, 440 (2d Cir.), cert. denied, 502 U.S. 852 (1991)). Indeed, "[t]he appropriate standard of review for a claim of prosecutorial misconduct on a writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power." Floyd v. Meachum, 907 F.2d at 353 (internal quotation marks and citations omitted).

Here, the prosecutor's comments do not rise to the level of "egregious misconduct" that would amount to a denial of petitioner's right to due process. With respect to the argument that the DNA evidence at the scene "matched" that of petitioner, the argument was a logical inference drawn from the expert's testimony that there was "less than [a] one in 500 million" probability that someone other than petitioner had raped the complaining witness. (Tr. at 203, 220). Similarly, there was clearly evidence in the record of the fear experienced by Ms. Rentas during

the assault, the brutal beating to her face, and the impairment of her vision as a result of the attack. The prosecutor's comments were not only supported by this evidence but were made in the context of an appeal to the jury to use its common sense.

Given the petitioner's failure to object to either of these comments at the time of trial and the fact that neither comment alone -- or even both together -- rises to the level of a federal constitutional violation, the Court concludes that petitioner has failed to satisfy the requirements of the AEDPA. The Appellate Division's denial of this claim was neither contrary to federal law nor an unreasonable application of the law. 28 U.S.C. § 2254(d)(1).

Accordingly, it is respectfully recommended that the third claim in the petition be denied.

### 4. Claim Four - Failure to Declare a Mistrial

Petitioner's fourth claim is based on the argument that the trial court erred in refusing to grant a mistrial after one of the prosecution's witnesses, Detective Astacio, mentioned that petitioner had been arrested in the office of his probation officer. Initially, as the transcript of proceedings makes clear, the trial court was willing to grant petitioner's request for a mistrial. (Tr. at 115-16). However, upon learning that the trial court would allow the complaining witness another opportunity to identify petitioner at the retrial, petitioner's counsel explicitly withdrew the request for a mistrial and petitioner agreed to the withdrawal when asked for permission to proceed with the trial. (Id. at 117-19). As discussed in this Court's Report of January 8, 2003, petitioner raised this claim on appeal (see Rep't at 10-11), and accordingly, it appears to be exhausted.

However, petitioner not only waived his right under state law to raise this claim by

explicitly withdrawing his request for a mistrial, see People v. White, 53 N.Y.2d 721, 723-24, 421 N.E.2d 825, 827, 439 N.Y.S.2d 333, 335 (1981); People v. Rodriguez, 50 N.Y.2d 553, 557-58, 407 N.E.2d 475, 476-77, 429 N.Y.S.2d 631, 633 (1980), but his failure to raise an objection at the time means that the claim was unpreserved for state appellate review. See N.Y. Crim. Proc. Law § 470.05(2) (McKinney 1994). When petitioner raised this claim on appeal to the Appellate Division, Second Department, the court found that petitioner's claim was "either unpreserved . . . or without merit." See People v. Rush, 242 A.D.2d at 111, 672 N.Y.S.2d at 364. (See also Rep't at 4 (citing Def.'s State Brief on Appeal; Ross Aff. ¶ 6)). Accordingly, the Court will address this claim on the merits. See Jimenez v. Walker, 458 F.3d at 136.

The trial court's decision to allow the complainant to identify her assailant at a retrial was tantamount to an evidentiary ruling, so that even on a review of the merits of the petitioner's claim of error, it is clear that the trial court's decision would not constitute a basis for a federal habeas claim unless it could be shown that the admission of the evidence constituted a denial of "fundamental fairness." Hall v. Wainwright, 733 F.2d 766, 770 (11th Cir.) (internal quotation omitted), reh'g denied en banc, 749 F.2d 733 (11th Cir. 1984), cert. denied, 471 U.S. 1107 (1985); see also Rosario v. Kuhlman, 839 F.2d 918, 925 (2d Cir. 1988). Here, no such showing has been made. Indeed, because the request for a mistrial was withdrawn, there was no retrial and the challenged evidence - - namely, the witness' in-court identification - - was never admitted. Therefore, there is no error and no basis on which to issue a writ of habeas corpus. It cannot be said that the Appellate Division's denial of this claim was either contrary to federal law or an unreasonable application of the law. 28 U.S.C. § 2254(d)(1).

Accordingly, it is respectfully recommended that the fourth claim in the petition be

denied.

### 5. Claim Seven[15] - Failure to Provide Documents

Rush's seventh claim is that the prosecution failed to disclose certain information relating to the prosecution's DNA expert's findings and to another suspect, Samuel Martin, as required by People v. Rosario, 9 N.Y.2d 286, 173 N.E.2d 881, 213 N.Y.S.2d 448, cert. denied, 368 U.S. 866 (1961). As noted in the district court's August 9, 2007 order referring this habeas petition to the undersigned, petitioner has now exhausted his seventh claim. Petitioner raised this claim on appeal to the Appellate Division, Second Department, which found that petitioner's claim was "either unpreserved . . . or without merit." See People v. Rush, 242 A.D.2d at 111, 672 N.Y.S.2d at 364. (See also Rep't at 4 (citing Def.'s State Brief on Appeal; Ross Aff. ¶ 6)). Accordingly, the Court will address this claim on the merits. See Jimenez v. Walker, 458 F.3d at 136.

To the extent that petitioner is relying on the state court rule articulated in Rosario to challenge his conviction, his claim does not present a federal question cognizable in a habeas corpus proceeding. Rosario requires the disclosure of all prosecution witness statements, and is a state procedural rule that has developed as a matter of state common law. See United States ex. Rel. Butler v. Schubin, 376 F. Supp. 1241, 1247 (S.D.N.Y. 1974), aff'd, 508 F.2d 837 (2d Cir. 1975). Therefore, any claim challenging a breach of that rule is not a violation of federal constitutional rights and cannot be reviewed by this Court in a federal habeas action. See 28 U.S.C. § 2254(a); United States ex. Rel. Butler v. Schubin, 376 F. Supp. at 1247. Thus, to the

---

[15]As noted supra, petitioner voluntarily withdrew the fifth and sixth grounds for relief set forth in his petition.

extent that petitioner argues that the State's failure to disclose information relating to Samuel Martin violated Rosario, this Court therefore respectfully recommends that petitioner's Rosario claim be denied as not subject to federal habeas review.

With respect to petitioner's claim that certain DNA evidence was not turned over by the prosecution, petitioner, during the course of appealing this claim, failed to alert the state court to any alleged federal constitutional violation that the State committed by not providing him with this information. In arguing now in his petition that the State failed to produce the paperwork on the DNA expert's testing, petitioner cites in his petition only state court decisions requiring reversal where there has been a Rosario violation. Since, as noted above, a Rosario violation is a claim based solely on state law and does not present a federal constitutional question, see Young v. McGinnis, 411 F. Supp. 2d 278, 329 (E.D.N.Y. 2006) (citing Morrison v. McClellan, 903 F. Supp. 428, 429 (E.D.N.Y. 1995)); Cruz v. Scully, 716 F. Supp. 766, 769 n.5 (S.D.N.Y. 1989), petitioner's claim that the State's failure to provide him with these documents violated Rosario is not subject to federal habeas review. See Young v. McGinnis, 411 F. Supp. 2d at 329 ; Cruz v. Scully, 716 F. Supp. at 769 n.5. Thus, this claim should be denied.

To the extent that petitioner may be relying on federal constitutional precedents requiring disclosure of exculpatory material as set forth in Brady v. Maryland, 373 U.S. 83 (1963),[16] petitioner has failed to articulate the significance of the information that he alleges was not disclosed by the prosecution, nor does he offer any basis on which to conclude that the information is exculpatory in any way. Thus, even if petitioner were to argue that the failure to

---

[16]Petitioner does not, however, cite to Brady or any other federal precedent in raising these claims.

disclose this information violated federal constitutional standards, he has not articulated how this violation either "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1).

Accordingly, this Court respectfully recommends that petitioner's claim in this regard be denied on the merits.

### 6. Claim Eight - Error in the Trial Transcript

In his eighth claim, petitioner asserts that due to an error in the trial transcript of the DNA expert's testimony, the wrong word was read to the jury during a requested read-back, and thus the jury improperly considered evidence outside the record, leading to a denial of a fair trial. In this Court's Report of January 8, 2003, the Court found that this claim was unexhausted because petitioner could still move for leave to appeal the Supreme Court's March 2, 1998 denial of petitioner's post-conviction motion to vacate the conviction pursuant to Section 440.10 of New York's Criminal Procedure Law, filed on November 17, 1997. (See Rep't at 16). However, in petitioner's objections to the Report, petitioner submitted an order from the Appellate Division, dated April 18, 1998, denying leave to appeal the Supreme Court order. Accordingly, this claim was exhausted and the Court may address it on the merits at this time.

Petitioner asserts that in several portions of the expert's testimony where the witness testified about a "visual" match, or he testified that he "visually" matched the petitioner's DNA profile with that in the forensic evidence, the court reporter read back to the jury the word "individual" match or "individually" matched, which the expert later explained has no scientific meaning in this context. (Ross Aff. ¶ 9). This error was not detected at the time of the read-back

to the jury and was only discovered by the prosecutor during the preparation of the People's response to petitioner's papers on appeal. (Id.) According to the prosecutor, Ms. Ross, she spoke to both the expert and the court reporter after her discovery, and determined from the court reporter that while the word had been properly recorded in his stenographic notes, the computer, in transcribing the word, generated the wrong word, which was not discovered by the reporter during his proof-reading of the transcript. (Id. ¶ 10). Ms. Ross then contacted petitioner's counsel, who agreed to stipulate to substitute the corrected pages. (Id. ¶ 11).

The prosecutor then filed a motion before the Appellate Division pursuant to N.Y. Comp. Codes R. & Regs. tit. 22, §§ 670.10(b)(5), 670.10(f), 670.12(a); and N.Y. C.P.L.R. § 5525, to resettle the record to reflect the corrections to the transcript. (Id. ¶ 12). The motion to resettle, which was not opposed, was granted on August 20, 1997. (Id. ¶ 13).

Thereafter, on November 17, 1997, while the petitioner's direct appeal was still pending before the Appellate Division, petitioner filed a motion, pursuant to New York Criminal Procedure Law § 440.10, to vacate his judgment of conviction, claiming that he had been denied a fair trial as a result of the errors in the transcript. (Id. ¶ 14). The trial court issued a decision dated March 2, 1998, declining to deny the motion on procedural grounds but denying petitioner's request for a new trial on the merits, finding that it was clear from the context of the complete transcript of the expert's testimony that he was conducting a "visual" comparison of the chromosomes. The court further found that it was also clear that regardless of whether the expert found an "individual match" or a "visual match," he found a match in the comparison process and the substitution of "individual" for "visual" during the readback, "did nothing to enhance the DNA expert's testimony that matches existed in the comparison process." (Dec. and Order,

dated March 2, 1998 at 3; Resp.'s Ex. D). The court concluded that not only did the erroneous readback not enhance the ultimate conclusion, but it was qualified by the expert's testimony that his test results "do not result in an absolute identification, as a fingerprint comparison results in an absolute identification." (Id. at 4; Tr. at 186).

In his current petition, Rush cites New York Criminal Procedure Law § 310.30 to argue that given the critical nature of the DNA evidence, it was plain error for the court to fail to correctly respond to a jury's request for information. He argues that the erroneous readback was tantamount to providing the jury with extraneous information outside the record that may have influenced the jury and contributed to the verdict. Petitioner seeks a hearing on whether the misreading had a material affect on the vote of the jury so as to deny him a fair trial.

Having reviewed the transcript of the expert's testimony, this Court agrees with the state court judge that, viewed in the totality of the expert's testimony, the mistaken substitution of the word "individual" for "visual" was harmless error. Certainly, petitioner's counsel did not object to the prosecution's motion to resettle the record. Moreover, petitioner has failed to suggest how the substitution of these words would result in any substantial change in the meaning of the expert's testimony or how it prejudiced petitioner in any way. While petitioner requests a hearing, it is unclear what purpose the hearing would serve at this time since the prosecution has conceded the error in the readback.

Accordingly, having reviewed the reasons stated by the state court in its decision of March 2, 1998, it cannot be said that the state court's decision was either contrary to clearly established federal law or an unreasonable application of the law, 28 U.S.C. § 2254(d)(1), and it is therefore respectfully recommended that the eighth claim in the petition be denied on the

36

merits as harmless error.

### 7. Claim Nine - Ineffective Assistance of Appellate Counsel

Petitioner's final claim is that he was denied the effective assistance of appellate counsel. He argues that his appellate counsel failed to raise a claim of ineffective assistance of trial counsel for trial counsel's failure to call certain alibi witnesses who petitioner contends would have testified that petitioner was about 50 miles, or one and one-half hours, away from the scene of the crime, and that weather reports would have shown that petitioner could not have reached the location of the crime in order to commit the crime. Petitioner also argues that his appellate counsel failed to appeal with respect to the error in the read-back of the transcript relating to the DNA evidence. As noted in the district court's August 9, 2007 order referring this habeas petition to the undersigned, petitioner has now exhausted his ninth claim. Petitioner raised this claim on appeal to the Appellate Division, Second Department, which explicitly found that petitioner had failed to establish that he was denied the effective assistance of appellate counsel. See People v. Rush, 265 A.D.2d 351, 351, 696 N.Y.S.2d 691, 691 (2d Dep't 1999). Accordingly, the Court will address this claim on the merits to determine if the Appellate Division's denial of the claim constituted "an unreasonable application of clearly established Federal law." 28 U.S.C. § 2254(d)(1). See Jimenez v. Walker, 458 F.3d at 136.

Where a defendant has made a claim that he received ineffective assistance of counsel, he must show that counsel's performance "fell below an objective standard of reasonableness" and that there is a reasonable probability that absent this error in performance, the outcome of the trial would have been different. Strickland v. Washington, 466 U.S. 668, 688 (1984); Gonzalez

37

v. United States, 337 F. Supp. 2d 419, 423 (E.D.N.Y. 2004) (citing United States v. Leslie, 103 F.3d 1093, 1099 (2d Cir.), cert. denied, 520 U.S. 1220 (1997)). In order to establish a claim of ineffective assistance of trial counsel, a petitioner must establish: (1) that counsel's performance was deficient in that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) that this deficient performance prejudiced the defense in that the errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland v. Washington, 466 U.S. at 687.

The Strickland standard for ineffective assistance of counsel applies to appellate counsel as well as trial counsel. See Smith v. Robbins, 528 U.S. 259, 285 (2000) (holding that "the proper standard for evaluating [petitioner's] claim that appellate counsel was ineffective in neglecting to file a merits brief is that enunciated in Strickland); Abdurrahman v. Henderson, 897 F.2d 71, 74 (2d Cir. 1990); Sellan v. Kuhlman, 63 F. Supp. 2d 262, 265 (E.D.N.Y. 1999), aff'd, 261 F.3d 303 (2d Cir. 2001). Accordingly, a petitioner alleging ineffective assistance of appellate counsel must prove both that (1) appellate counsel acted unreasonably in failing to raise a particular issue on appeal, and (2) absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful before the state's highest court. See id.; Aparicio v. Artuz, 269 F.3d at 95.

Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." Smith v. Robbins, 528 U.S. at 288 (internal citations omitted). Indeed, it is not the role of a reviewing court to second-guess the reasonable professional judgments of appellate counsel as to the most promising claims on appeal. Lugo v. Kuhlmann, 68 F. Supp. 2d 347, 371-72 (S.D.N.Y. 1999).

Thus, in order to establish constitutionally inadequate performance, a petitioner must show that appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Rivera v. Portuondo, 156 Fed. Appx. 426, 427 (2d Cir. 2005) (quoting Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994)).

Prior to the passage of the AEDPA, habeas review of a claim of ineffective assistance of appellate counsel required courts to "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." James v. Coughlin, 22 F.3d 427, 429 (2d Cir. 1994) (quotations and citations omitted). Under the AEDPA, a habeas court reviewing the decision of a state appellate court that has denied a claim of ineffective assistance of counsel must deny an application for a writ of habeas corpus unless the adjudication of the state law claim "involved an unreasonable application of [] clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Moreover, this Court is limited to determining that state appellate counsel was ineffective only if counsel failed to raise a claim on behalf of the defendant that implicated a clearly established federal law as determined by the Supreme Court. See Mosby v. Senkowski, 470 F.3d 515, 521 (2d Cir. 2006); Sellan v. Kuhlman, 63 F. Supp. 2d at 269. Failure to raise a meritorious issue of state law on appeal may give rise to a violation of federal law sufficient to sustain habeas corpus relief only if the relevant standards under Strickland are met. Id. Under the AEDPA, "the Strickland standard . . . is the relevant 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Aparicio v. Artuz, 269 F.3d at 95 & n.8 (quoting 28 U.S.C. § 2254(d)(1)). However, for purposes of the AEDPA, a petitioner need not demonstrate

39

that his particular theory of ineffective assistance of counsel is itself also "clearly established." Id. at 95 n.8. Rather, for a petitioner to succeed under § 2254(d)(1), he must show that the state court applied Strickland to the facts of his case in an "objectively unreasonable manner." Bell v. Cone, 535 U.S. 685, 698-99 (2002); see also Yarborough v. Gentry, 540 U.S. 1 (2003).

Here, petitioner's claim of ineffective assistance of appellate counsel is based on appellate counsel's failure to raise the issue of ineffective assistance of trial counsel, and failure to raise the issue of an erroneous read-back to the jury of the trial transcript. With respect to his contention that appellate counsel failed to raise a claim of ineffective assistance of trial counsel, petitioner relies on the fact that trial counsel did not call an alibi witness or introduce evidence of the weather on the day the crime was committed in order to show that petitioner could not have been present at the location of the crime when it occurred.

In denying petitioner's state writ of coram nobis, in which he raised this claim of ineffective assistance of appellate counsel, the Appellate Division explicitly found that petitioner had failed to establish that he was denied the effective assistance of appellate counsel. People v. Rush, 265 A.D.2d at 351, 696 N.Y.S.2d at 691. Indeed, failure of appellate counsel to raise the issue of ineffective assistance of trial counsel, standing alone, does not constitute ineffective assistance of appellate counsel, see Larrea v. Bennett, 368 F.3d 179, 184 (2d Cir. 2004). Moreover, as discussed supra at 35, the matter of the erroneous read-back was settled by stipulation of the parties (Ross Opp.[17] ¶ 11), and the Appellate Division granted the prosecutor's unopposed motion to settle the record with respect to the read-back on August 20, 1997. (Id. ¶

---

[17]Citations to "Ross. Opp." refer to the Affirmation in Opposition to Motion to Vacate the Judgment of Conviction of Ruth E. Ross, dated January 16, 2004.

13). Thereafter, on March 2, 1998, the trial court denied petitioner's motion to vacate his judgment of conviction on the merits, finding that the error in the trial transcript was harmless error. (Id. ¶ 16).

Under the AEDPA standards, this Court, in reviewing the Appellate Division's denial of petitioner's ineffective assistance of counsel, concludes that the state court did not apply Strickland in an "objectively unreasonable manner." Bell v. Cone, 535 U.S. at 698-99. Instead, it is clear that appellate counsel raised six colorable legal issues on appeal, and stated in an affirmation dated April 16, 1999, that he found nothing in the record to support a claim of ineffective assistance of trial counsel on the basis petitioner asserts. (Resp.'s Mem, Ex. H at 2). Given that it is not this Court's role to second-guess appellate counsel's reasonable professional judgment, it cannot be said that the Appellate Division's application of Strickland to the facts of petitioner's ineffective assistance of appellate counsel claim was contrary to, or an unreasonable application of, clearly established federal law.

Thus, this Court respectfully recommends that the ninth claim of ineffective assistance of appellate counsel be denied.


CONCLUSION

In conclusion, this Court respectfully recommends as follows:

1) Petitioner's first claim challenging the sufficiency of the DNA evidence to prove guilt beyond a reasonable doubt should be denied on the merits.

2) Petitioner's second claim that the trial court erred in denying petitioner's request to delay the trial to allow for DNA testing should be denied on the merits.

41

3) Petitioner's third claim of prosecutorial misconduct should be denied on the merits.

4) Petitioner's fourth claim regarding the testimony of the prosecution's witness should be denied on the merits.

5) Petitioner's seventh claim, to the extent that he argues a violation of <u>Rosario</u>, should be denied on the grounds that petitioner has failed to assert a federal <u>habeas</u> claim under 28 U.S.C. § 2254(d). To the extent that petitioner relies on <u>Brady</u>, it is respectfully recommended that petitioner's claim in this regard be denied on the merits.

6) Petitioner's eighth claim regarding the error in the read-back of the expert's testimony should be denied on the merits as harmless error.

7) Petitioner's ninth claim of ineffective assistance of counsel should be denied on the merits.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b); <u>Small v. Sec'y of Health and Human Servs.</u>, 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to mail copies of this Report and Recommendation to the parties.

**SO ORDERED.**

Dated: Brooklyn, New York
August 7, 2008

Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York